EXHIBIT B

Page 3

**Certificate**

1 7 0 0 2 7 0 0 0     FORM E

| CLASS | REGISTRATION NO. |
|-------|------------------|
| **E**  | Ep   215051 |

DO NOT WRITE HERE

## Registration of a Claim to Copyright

In a musical composition the author of which is a citizen of domiciliary of the United States of America or which was first published in the United States of America

This Is To Certify that the statements set forth in this certificate have been made a part of the records of the Copyright Office. In witness whereof the seal of the Copyright Office is hereto affixed.

*Register of Copyrights*
*United States of America*

**1. Copyright Claimant(s) and Address(es):**

Name ___ DETROIT JOBETE, INC. ___

Address ___ 2648 WEST GRAND BOULEVARD ___

Name ___

Address ___

**2. Title:** ___ "AIN'T TOO PROUD TO BEG" ___
(Title of the musical composition)

**3. Authors:**

Name ___ EDDIE HOLLAND ___   Citizenship: U.S.A. __X__ Other ___
(Legal name followed by pseudonym if latter appears on the copies)   (Check if U.S. citizen)   (Name of country)

Domiciled in U.S.A. Yes __X__ No ___ Address ___ 2648 WEST GRAND BOULEVARD ___ Author of ___ WORDS AND MUSIC ___
(State which: words, music, arrangement, etc.)

Name ___ NORMAN WHITFIELD ___   Citizenship: U.S.A. __X__ Other ___
(Legal name followed by pseudonym if latter appears on the copies)   (Check if U.S. citizen)   (Name of country)

Domiciled in U.S.A. Yes __X__ No ___ Address ___ 2648 WEST GRAND BOULEVARD ___ Author of ___ WORDS AND MUSIC ___
(State which: words, music, arrangement, etc.)

Name ___
(Legal name followed by pseudonym if latter appears on the copies)   Citizenship: U.S.A. ___ Other ___
(Check if U.S. citizen)   (Name of country)

Domiciled in U.S.A. Yes ___ No ___ Address ___ Author of ___
(State which: words, music, arrangement, etc.)

**4. (a) Date of Publication:**

___ 5 ___      ___ 2 ___      ___ 66 ___
(Month)         (Day)          (Year)

**(b) Place of Publication:**

___ U.S.A. ___
(Name of country)

**5. Previous Registration or Publication:**

Was work previously registered? Yes ___ No ___ Date of registration ___ Registration number ___

Was work previously published? Yes ___ No ___ Date of publication ___ Registration number ___

Is there any substantial NEW MATTER in this version? Yes ___ No ___ If your answer is "Yes," give a brief general statement of the nature of the NEW MATTER in this version.

EXAMINER

*Complete all applicable spaces on next page*

6. **Deposit account:**

7. **Send correspondence to:**

Name ..... DETROIT JOBETE ... INC. ..... Address ... 2648 WEST GRAND BOULEVARD ...

8. **Send certificate to:**

(Type or print name and address)

Name
DETROIT JOBETE, INC.

2648 WEST GRAND BOULEVARD
(Number and street)

DETROIT                     MICHIGAN
(City)                      (State)               (ZIP code)

## Information concerning copyright in musical compositions

*When To Use Form E.* Form E is appropriate for unpublished and published musical compositions by authors who are U.S. citizens or domiciliaries, and for musical compositions first published in the United States.

*What Is a "Musical Composition"?* The term "musical composition" includes compositions consisting of music alone, or of words and music combined. It also includes arrangements and other versions of earlier compositions, if new copyrightable work of authorship has been added.

—*Song Lyrics Alone.* The term "musical composition" does not include song poems and other works, consisting of words without music. Works of that type are not registrable for copyright in unpublished form.

—*Sound Recordings.* Phonograph records, tape recordings, and other sound recordings are not regarded as "copies" of the musical compositions recorded on them, and are not acceptable for copyright registration. For purposes of deposit, the musical compositions should be written in some form of legible notation. If the composition contains words, they should be written above or beneath the notes to which they are sung.

*Duration of Copyright.* Statutory copyright begins on the date the work was first published, or, if the work was registered for copyright in unpublished form, copyright begins on the date of registration. In either case, copyright lasts for 28 years, and may be renewed for a second 28-year term.

### Unpublished musical compositions

*How To Register a Claim.* To obtain copyright registration, mail to the Register of Copyrights, Library of Congress, Washington, D.C., 20540, one complete copy of the musical composition, an application Form E, properly completed and signed, and a fee of $6. Manuscripts are not returned, so do not send your only copy.

*Procedure To Follow if Work Is Later Published.* If the work is later reproduced in copies and published, it is necessary to make a second registration, following the procedure outlined below. To maintain copyright protection, all copies of the published edition must contain a copyright notice in the required form and position.

### Published musical compositions

*What Is "Publication"?* Publication, generally, means the sale, placing on sale, or public distribution of copies. Limited distribution of so-called "professional" copies ordinarily would not constitute publication. However, since the dividing line between a preliminary distribution and actual publication may be difficult to determine, it is wise for the author to affix notice of copyright to copies that are to be circulated beyond his control.

*How To Secure Copyright in a Published Musical Composition:*

1. *Produce copies with copyright notice,* by printing or other means of reproduction.
2. *Publish the work.*
3. *Register the copyright claim,* following the instructions on page 1 of this form.

*The Copyright Notice.* In order to secure and maintain copyright protection for a published work, it is essential that all copies published in the United States contain the statutory copyright notice. This notice shall appear on the title page or first page of music and must consist of three elements:

1. *The word "Copyright," the abbreviation "Copr.," or the symbol ©.* Use of the symbol © may result in securing copyright in countries which are parties to the Universal Copyright Convention.

2. *The year date of publication.* This is ordinarily the date when copies were first placed on sale, sold, or publicly distributed. However, if the work has been registered for copyright in unpublished form, the notice should contain the year of registration; or, if there is new copyrightable matter in the published version, it should include both dates.

3. *The name of the copyright owner (or owners).* Example: © John Doe 1966.

NOTE: If copies are published without the required notice the right to secure copyright is lost and cannot be restored.

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received **MAY -9 1966** | |
| One copy received | |
| Two copies received **MAY -9 1966** | |
| Fee received | |

C 1 7 0 0 2 4 9 0 0 0

# "Ain't Too Proud To Beg"

words & music by:

## EDDIE HOLLAND & NORMAN WHITFIELD



1. I KNOW YOU WAN-NA LEAVE ME BUT I RE-FUSE TO LET YOU GO
(2.)

IF I HAVE TO BEG PLEAD FOR YOUR SYM-PA-THY I DON'T MIND

CAUSE YOU MEAN THAT MUCH TO ME AIN'T TOO PROUD TO BEG AND YOU KNOW IT PLEASE DON'T LEAVE
(CHORUS)                                                                                    (SWEET DAR-LIN')

ME GIRL DON'T YOU GO AIN'T TOO PROUD TO PLEAD BA-BY BA-

BY PLEASE DON'T LEAVE ME GIRL DON'T YOU GO 2. NOW I'VE HEARD 3. IF I HAVE TO
(1st ending)                (2nd ending)

SLEEP ON YOUR DOOR-STEP ALL NIGHT AND DAY JUST TO KEEP YOU FROM WALKING A-WAY

LET YOUR FRIENDS LAUGH EV-EN THIS I CAN STAND 'CAUSE I
(4.)

©1966 Jobete Music Company, Inc.                              all rights reserved

(Ain't Too Proud To Beg)

0 1 7 6 0 2 4 9 0 0 1



WAN-NA  KEEP  YOU      A-NY WAY  I  CAN  AIN'T TOO PROUD TO BEG  SWEET
(chorus)                                                          ( AND YOU

DAR- LING PLEASE DON'T LEAVE ME GIRL DON'T YOU GO____  AIN'T TOO PROUD TO

PLEAD.___ BA - BY  BA - BY_ PLEASE DON'T LEAVE ME GIRL DON'T YOU GO.____
know it

___ 4. NOW I'VE GOT A  ____  BA -BY BA-BY  BA-BY   BA- BY  BA-

- BY  PLEASE DON'T LEAVE ME GIRL DON'T YOU GO.____  AIN'T TOO PROUD TO

BEG  BA-BY  BA - BY  AIN'T TOO PROUD TO LEAVE ___ YOU DON'T YOU GO.____

2nd Verse: A CRYIN' MAN IS HALF A MAN WITH NO SENSE OF PRIDE
BUT IF I HAVE TO CRY TO KEEP YOU, I DON'T MIND WEEPIN' IF IT WILL KEEP YOU BY MY SIDE
( CHORUS )

4th Verse: NOW I'VE GOT A LOVE SO DEEP IN THE PIT OF MY HEART
AND EACH DAY IT GROWS MORE AND MORE
I'M NOT ASHAMED TO CALL AND PLEAD TO YOU BABY
IF PLEADING KEEPS YOU FROM WALKING OUT THAT DOOR
( CHORUS )



*Broadcast Music, Inc.*   320 *West 57th Street, New York, N.Y. 10019*   . 212 586-2000
*Cable Address: Broadstmus NY*

February 7, 1983

Stone Diamond Music Corp.
6255 Sunset Boulevard Suite 1600
Department 4-7566
Los Angeles, California 90028

Gentlemen:

This will confirm our understanding with respect
to the modification of the agreement between us dated June
25, 1981 (herein called the "basic agreement"):

You hereby warrant and represent that, although
the works contained in the catalogue of Stone Agate Music
Division, a Division of Jobete Music Co., Inc., are registered
for copyright in the name of Jobete Music Co., Inc., the
performing rights therein are owned and/or controlled by you
and have been and will continue to be licensed by BMI for the
term of the basic agreement.

Except as herein specifically modified, all of the
terms and conditions of the basic agreement, as heretofore
modified, are hereby ratified and affirmed.

ACCEPTED AND AGREED TO:                Very truly yours,

STONE DIAMOND MUSIC CORP.              BROADCAST MUSIC, INC.

By _____            By _____
   Executive Vice President              Senior Vice President

STONE AGATE MUSIC DIVISION,
a Division of JOBETE MUSIC
CO., INC.

By _____
   Executive Vice President

GFR:rls

# STONE DIAMOND MUSIC CORP.

December 5, 1985

Al Feilich
BROADCAST MUSIC INC.
320 West 57th Street
New York, New York  10017

RE:  "AIN'T TOO PROUD TO BEG"

Dear Mr. Feilich,

This is in response to your letter in reference to the above-mentioned composition.

This is to confirm that the song "AIN'T TOO PROUD TO BEG" and all other compositions that are copyrighted in the name of Detroit Jobete, Inc., are included in the basic agreement between Stone Diamond Music Corp./Stone Agate Music Division and BMI dated February 7, 1983.

With Best regards, I remain.

Sincerely,

Erlinda N. Barrios
Executive Director
 of Administration

ENB/jj

cc:  Frank F. Banyai

331166



AGREEMENT made on November 16, 2005 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and Stone Diamond Music Corporation, a Michigan corporation ("Publisher"), whose address is c/o EMI Music Publishing, 810 Seventh Avenue, 36th Floor, New York, NY  10019-5818

### WITNESSETH:

1.  The term of this agreement shall be the period from    April 1, 2005   to   December 31, 2008,   and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2.  As used in this agreement, the word "Work" or "Works" shall mean:

A.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3.  Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A.  All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B.  The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C.  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4.  Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A. The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

THIS PAGE INTENTIONALLY LEFT BLANK

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1) For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6. In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B. ~~The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect, and subject thereto, notwithstanding such termination, BMI shall have the right to continue in renewal of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.~~

*you may choose to*
10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which ~~may~~ continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

B.  In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C.  In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A.  With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B.  Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C.  The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D.  Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E.  Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

13.   Publisher warrants and represents that:

A.   Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B.   Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A.   Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B.   Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense.  Publisher agrees to cooperate with BMI in all such matters.

C.   In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15.   Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder.  In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A.   It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

17.  BMI shall have the right, in its sole discretion, to terminate this agreement if:

A. Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1)  Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2)  Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3)  Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17.

(4)  Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

C. Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

18.  In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

19.  Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21. Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22. Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's postal or electronic ("e-mail") address, or facsimile number. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last postal or electronic address or facsimile number so furnished by Publisher.

23. This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24. Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25. Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26. This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28. Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

**BROADCAST MUSIC, INC**

By ...................................................................................................................................

~~SENIOR~~ Vice President

**"PUBLISHER"**

By ....................................................................  CHAIRMAN
      (Authorized Signatory)                         (Print Name and Title of Signer)

**If your company structure is a PARTNERSHIP, all other partners must sign below:**

By ..............................................................................................................................
      Partner                                        Printed Name

By ..............................................................................................................................
      Partner                                          Printed Name

By ..............................................................................................................................
      Partner                                          Printed Name

By ..............................................................................................................................
      Partner                                          Printed Name

By ..............................................................................................................................
      Partner                                          Printed Name

**THIS PAGE INTENTIONALLY LEFT BLANK**

# CERTIFICATE OF COPYRIGHT REGISTRATION

**FORM PA**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PA 568 699

PA PAU

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

**REGISTER OF COPYRIGHTS**
*United States of America*

OFFICIAL SEAL

EFFECTIVE DATE OF REGISTRATION

MAR 06 1992
Month   Day   Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**

BREAKING THE GIRL

**PREVIOUS OR ALTERNATIVE TITLES ▼**

NOT APPLICABLE

**NATURE OF THIS WORK ▼** See instructions

WORDS AND MUSIC

## 2

**NAME OF AUTHOR ▼**

a ANTHONY KIEDIS

DATES OF BIRTH AND DEATH
Year Born ▼ 1962   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼
WORDS AND MUSIC

**NAME OF AUTHOR ▼**

MICHAEL BALZARY A.K.A. FLEA ☆

DATES OF BIRTH AND DEATH
Year Born ▼ 1962   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼
WORDS AND MUSIC

**NAME OF AUTHOR ▼**

CHAD SMITH

DATES OF BIRTH AND DEATH
Year Born ▼ 1962   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼
WORDS AND MUSIC

**NOTE**
Under the law, the "author" of a

## 3

a **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
1991 ◀ Year

b **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ Sep   Day ▶ 24   Year ▶ 1991   Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2.▼
MOEBETOBLAME MUSIC
c/o Lindy Goetz
11116 Aqua Vista, #39
Studio City, California 91602

**TRANSFER** If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.▼
Transfer of all rights by Authors.

APPLICATION RECEIVED
MAR 06 1992

ONE DEPOSIT RECEIVED
MAR 06 1992

TWO DEPOSITS RECEIVED

REMITTANCE NUMBER AND DATE

DO NOT WRITE HERE

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions. • Sign the form at line 8.

DO NOT WRITE HERE

☆ Amended by C10, Authority of covering letter
dated May 11, 1992.

EXAMINED BY

CHECKED BY

☑ CORRESPONDENCE
   Yes

PA 568 699

FORM PA

FOR
COPYRIGHT
OFFICE
USE
ONLY

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼                Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

b. Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account
Name ▼                                    Account Number ▼

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/Zip ▼
RED HOT CHILI PEPPERS
c/o MYMAN, ABELL, FINEMAN & GREENSPAN
11777 San Vicente Boulevard, Suite 880
Los Angeles, California 90049
Attn: Eric Greenspan,  Area Code & Telephone Number ▶ (310) 820-7717

**8**

Be sure to
give your
daytime phone
number

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▼
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  Moebetoblame Music
              Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
ERIC R. GREENSPAN, ESQ.                        date ▶ January 29, 1...

Handwritten signature (X) ▼
X

**MAIL
CERTIFI-
CATE TO**

Name ▼ Eric R. Greenspan, Esq.
MYMAN, ABELL, FINEMAN & GREENSPAN
Number/Street/Apartment Number ▼
11777 San Vicente Boulevard, Suite 880
City/State/ZIP ▼
Los Angeles, California 90049

Certificate
will be
mailed in
window
envelope

**9**

YOU MUST:
• Complete all necessary spaces
• Sign your application in ...
SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE
1. Application form
2. Nonrefundable $10 fee ...
   in check or money order ...
   payable to Register of ...
3. Deposit material
MAIL TO:
Register of Copyrights
Library of Congress
Washington, D.C. 20559

* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any ...
connection with the application, shall be fined not more than $2,500.

June 1989—200,000

☆ U.S. GOVERNMENT PRINTING

# CONTINUATION SHEET FOR FORM PA

**FORM PA/CON**
UNITED STATES COPYRIGHT OFFICE

- If at all possible, try to fit the information called for into the spaces provided on Form PA.
- If you do not have space enough for all of the information you need to give on Form PA, use this continuation sheet and submit it with Form PA.
- If you submit this continuation sheet, clip (do not tape or staple) it to Form PA and fold the two together before submitting them.
- PART A of this sheet is intended to identify the basic application. PART B is a continuation of Space 2. PART C (on the reverse side of this sheet) is for the continuation of Spaces 1, 4, or 6. The other spaces on Form PA call for specific items of information, and should not need continuation.

**REGISTRATION NUMBER**

PA **568 699**
PA — PAU

**EFFECTIVE DATE OF REGISTRATION**
MAR 06 1992
(Month) (Day) (Year)

**CONTINUATION SHEET RECEIVED**
MAR 06 1992

Page **2** of **2** pages

---

**DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY**

**(A)**
**Identification of Application**

**IDENTIFICATION OF CONTINUATION SHEET:** This sheet is a continuation of the application for copyright registration on Form PA, submitted for the following work:

- **TITLE:** (Give the title as given under the heading "Title of this Work" in Space 1 of Form PA.)
  BREAKING THE GIRL
- **NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S):** (Give the name and address of at least one copyright claimant as given in Space 4 of Form PA.)
  Moebetoblame Music, % Lindy Goetz,
  11116 Aqua Vista, #39, Studio City, California 91602.

**(B)**
**Continuation of Space 2**

| NAME OF AUTHOR: JOHN FRUSCIANTE | DATES OF BIRTH AND DEATH: Born 1970 Died |
|---|---|

Was this author's contribution to the work a "work made for hire"? Yes...... No XX..

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of United States } or { Domiciled in ........................
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes...... No XX...
Pseudonymous? Yes...... No XX...
If the answer to other of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)
WORDS AND MUSIC

---

| NAME OF AUTHOR: | DATES OF BIRTH AND DEATH: Born ...... Died ...... |
|---|---|

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of ...................... } or { Domiciled in ........................
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes...... No......
Pseudonymous? Yes...... No......
If the answer to other of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

| NAME OF AUTHOR: | DATES OF BIRTH AND DEATH: Born ...... Died ...... |
|---|---|

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of ...................... } or { Domiciled in ........................
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes...... No......
Pseudonymous? Yes...... No......
If the answer to other of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

| NAME OF AUTHOR: | DATES OF BIRTH AND DEATH: Born ...... Died ...... |
|---|---|

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of ...................... } or { Domiciled in ........................
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes...... No......
Pseudonymous? Yes...... No......
If the answer to other of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

| NAME OF AUTHOR: | DATES OF BIRTH AND DEATH: Born ...... Died ...... |
|---|---|

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of ...................... } or { Domiciled in ........................
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes...... No......
Pseudonymous? Yes...... No......
If the answer to other of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

*Use the reverse side of this sheet if you need more space for:*
- *Further continuation of Space 2*
- *Continuation of Spaces 1, 4, or 6 of Form PA*

DATES OF BIRTH AND DEATH:
Born....... Died.......
(Year)        (Year)

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of .................. } or { Domiciled in ..................
(Name of Country)                        (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**

Anonymous?  Yes...  No......
Pseudonymous?  Yes...  No......

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

**NAME OF AUTHOR:**

DATES OF BIRTH AND DEATH:
Born....... Died.......
(Year)        (Year)

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of .................. } or { Domiciled in ..................
(Name of Country)                        (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**

Anonymous?  Yes...  No......
Pseudonymous?  Yes...  No......

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

**NAME OF AUTHOR:**

DATES OF BIRTH AND DEATH:
Born....... Died.......
(Year)        (Year)

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of .................. } or { Domiciled in ..................
(Name of Country)                        (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**

Anonymous?  Yes...  No......
Pseudonymous?  Yes...  No......

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

**NAME OF AUTHOR:**

DATES OF BIRTH AND DEATH:
Born....... Died.......
(Year)        (Year)

Was this author's contribution to the work a "work made for hire"? Yes...... No......

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of .................. } or { Domiciled in ..................
(Name of Country)                        (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**

Anonymous?  Yes...  No......
Pseudonymous?  Yes...  No......

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

**CONTINUATION OF** (Check which):  ☐ Space 1  ☐ Space 4  ☐ Space 6

PA  568 699

# BREAKINGTHEGIRL

BY ANTHONY KIEDIS, FLEA, JOHN FRUSCIANTE & CHAD SMITH











*Additional lyrics*

2. Raised by my dad,
   girl of the day.
   He was my dad,
   that was the way.
   She was the girl,
   left alone.
   Feeling the need
   to make me her home.
   I don't know what, when or why
   the twilight of love had arrived.

#235724



AGREEMENT made on   May 1, 2002 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and Michael Balzary, John Anthony Frusciante, Anthony Kiedis and Chad Gaylord Smith, a partnership doing business as MOEBETOBLAME MUSIC ("Publisher"), whose address is c/o Myman, Abell, Fineman, et al. 11601 Wilshire Blvd., Suite 2200, Los Angeles, CA 90025

## WITNESSETH:

1.   The term of this agreement shall be the period from                    October 1, 2001 to       September 30, 2004            , and continuing thereafter for additional periods of two (2) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2.   As used in this agreement, the word "Work" or "Works" shall mean:

A.   All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B.   All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership of control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3.   Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A.   All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B.   The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C.   The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4.   Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A.   The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

P800

Page 1 of  10

THIS PAGE INTENTIONALLY LEFT BLANK

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1) For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6. In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B. The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

P800

B. In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A. With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

13. Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B. Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15. Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

P800                                                                                                    Page 6 of 10

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

17. BMI shall have the right, in its sole discretion, to terminate this agreement if:

A. Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1) Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17.

(4) Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

C. Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

18. In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

19. Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

P800                                                                 Page 7 of 10

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21. Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22. Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address furnished in writing by Publisher to BMI's Department of Writer/Publisher Administration.

23. This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24. Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25. Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26. This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28. Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

**BROADCAST MUSIC, INC**

By _Evelyn Buchstein_

*Asst* Vice President

---

**"PUBLISHER"**

By _____     Michael Balzary, Partner
     (Authorized Signatory)              (Print Name and Title of Signer)

**If your company structure is a PARTNERSHIP, all other partners must sign below:**

By _____     John Anthony Frusciante
     Partner                             Printed Name

By _____     Anthony Kiedis
     Partner                             Printed Name

By _____     Chad Gaylord Smith
     Partner                             Printed Name

By _____     _____
     Partner                             Printed Name

By _____     _____
     Partner                             Printed Name

P800                                          Page 9 of 10

**THIS PAGE INTENTIONALLY LEFT BLANK**



April 30, 2002

Moebetoblame Music
11601 Wilshire Blvd., Suite 2200
Los Angeles, CA 90025

Gentlemen:

This will confirm our understanding with respect to the modification of the agreement dated October 11, 1984 between Anthony Kiedis, Michael Balzary, Cliff Martinez and Jack Morris Sherman, a partnership doing business as Mobetoblame Music (herein called the "former owner") and Broadcast Music, Inc. as modified, (herein called the "basic agreement"):

1. You warrant and represent that all right, title and interest of the former owner in and to the basic agreement and in and to the works embraced thereby has been sold, assigned and transferred to Michael Balzary, John Anthony Frusciante, Anthony Kiedis and Chad Gaylord Smith, a partnership doing business as Moebetoblame Music (herein called the "new owner").

2. Effective as of October 1, 2001 the new owner shall be deemed to have acquired all rights and assumed all obligations of the former owner in and to the basic agreement.

Except as herein specifically modified, all of the terms and conditions of the basic agreement are hereby ratified and affirmed.

Very truly yours,

BROADCAST MUSIC, INC.

By _____
Senior Vice President

ACCEPTED AND AGREED TO:

_____
Anthony Kiedis

_____
Michael Balzary

(see attached)
Cliff Martinez

(see attached)
Jack Morris Sherman

_____
John Anthony Frusciante

_____
Chad Gaylord Smith

320 West 57th Street, New York, NY 10019-3790    (212) 586-2000

April 30, 2002

Broadcast Music, Inc.
320 West 57th Street
New York, NY 10019

Dear Sirs/Madams:

The undersigned Michael Balzary, John Anthony Frusciante, Anthony Kiedis and Chad Gaylord Smith warrant, represent and agree as follows:

1. On August 8, 1984, Michael Balzary, Cliff Martinez, Anthony Kiedis and Jack Sherman (herein the "former partners") entered into a Music Publishing Partnership Agreement (herein the "partnership agreement") doing business as Mobetoblame Music (later changed to Moebetoblame Music).

2. On October 11, 1984 said partnership entered into a publisher affiliation agreement with BMI under the name of Mobetoblame Music (herein the "BMI affiliation agreement "), which agreement is currently in existence.

3. Paragraph 13 of the partnership agreement provided that: "Any Partner may be expelled from the Partnership, with or without cause, by a majority of the Partners, by said majority of the Partners giving ten (10) days written notice thereof to such Partner to be expelled." Both Cliff Martinez and Jack Sherman were separately expelled from the partnership by a majority of the partners by giving appropriate written notice to each of them. All payments due the expelled partners after expulsion pursuant to the partnership agreement have been made and will continue to be made.

4. Subsequent to the expulsion of Cliff Martinez and Jack Sherman, on February 1, 1989 the undersigned, John Anthony Frusciante and Chad Gaylord Smith, were substituted in their place under the partnership agreement.

5. In consideration of the foregoing warranties and representations and in reliance thereon, the undersigned have requested that BMI substitute Michael Balzary, John Anthony Frusciante, Anthony Kiedis and Chad Gaylord Smith in the place of the former partners under the BMI affiliation agreement and any substitutions therefor.

Broadcast Music, Inc.                    -2-                    April 30, 2002

6. Each of the undersigned, jointly and severally, agree to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the substitution of the undersigned as partners in the place of the former partners under the BMI affiliation agreement and any substitutions therefor and all payments to the substituted partnership under said affiliation agreement and any substitutions therefor.

Very truly yours,

Michael Balzary

John Anthony Frusciante

Anthony Kiedis

Chad Gaylord Smith

# CERTIFICATE OF RENEWAL REGISTRATION

**FORM RE**
UNITED STATES COPYRIGHT OFFICE

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 304 of title 17, United States Code, attests that renewal registration has been made for the work identified below. The information has been made a part of the Copyright Office records.

*993

**REGISTER OF COPYRIGHTS**
United States of America

OFFICIAL SEAL

REGISTRATION NUMBER

RE  422-869

EFFECTIVE DATE OF RENEWAL REGISTRATION

MAR 0 6 1989

---

**DO NOT WRITE ABOVE THIS LINE.   FOR COPYRIGHT OFFICE USE ONLY**

**① RENEWAL CLAIMANT(S), ADDRESS(ES), AND STATEMENT OF CLAIM: (See Instructions)**

1  Name  Willie Nelson
   Address  c/o Mark Rothbaum & Assoc.   P O Box 2689   Danbury, CT   06811
   Claiming as  The Author

2  Name
   Address
   Claiming as

3  Name
   Address
   Claiming as

**TITLE OF WORK IN WHICH RENEWAL IS CLAIMED:**

CRAZY

**RENEWABLE MATTER:**

Words and Music

**CONTRIBUTION TO PERIODICAL OR COMPOSITE WORK:**

Title of periodical or composite work:

If periodical or serial work, give: Vol.          No.          Issue Date

**③ AUTHOR(S) OF RENEWABLE MATTER:**

Willie Nelson

**④ ORIGINAL REGISTRATION NUMBER:**          **ORIGINAL COPYRIGHT CLAIMANT:**

EP 156698                                     Pamper Music, Inc.

**ORIGINAL DATE OF COPYRIGHT:**

If the original registration for this work was made in published form:   OR   If the original registration for this work was made in unpublished form:

DATE OF PUBLICATION:  September 22, 1961          DATE OF REGISTRATION:

RE   422-869

EXAMINED BY

CHECKED BY

DEPOSIT ACCOUNT
FUNDS USED

RENEWAL APPLICATION RECEIVED
JAN 05 1989

REMITTANCE NUMBER AND DATE

FUNDS RECEIVED   MAR 06 1989

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY**

**RENEWAL FOR GROUP OF WORKS BY SAME AUTHOR:** To make a single registration for a group of works by the same individual author published as contributions to periodicals (see instructions), give full information about each contribution. If more space is needed, request continuation sheet (Form RE/CON).

| | | | | |
|---|---|---|---|---|
| 1 | Title of Contribution: ............... Title of Periodical ................... Date of Publication: (Month) (Day) (Year) | Vol No Registration Number | Issue Date .. | |
| 2 | Title of Contribution: ............... Title of Periodical ................... Date of Publication: (Month) (Day) (Year) | Vol No Registration Number | Issue Date .. | |
| 3 | Title of Contribution: ............... Title of Periodical ................... Date of Publication: (Month) (Day) (Year) | Vol No Registration Number | Issue Date .. | |
| 4 | Title of Contribution: ............... Title of Periodical ................... Date of Publication: (Month) (Day) (Year) | Vol No Registration Number | Issue Date .. | |
| 5 | Title of Contribution: ............... Title of Periodical ................... Date of Publication: (Month) (Day) (Year) | Vol No Registration Number | Issue Date .. | |
| 6 | Title of Contribution: ............... Title of Periodical ................... Date of Publication: (Month) (Day) (Year) | Vol No Registration Number | Issue Date .. | |
| 7 | Title of Contribution: ............... Title of Periodical ................... Date of Publication: (Month) (Day) (Year) | Vol No Registration Number | Issue Date .. | |

**DEPOSIT ACCOUNT:** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name: TREE PUBLISHING CO. INC.

Account Number: DA 032395

**CORRESPONDENCE:** Give name and address to which correspondence about this application should be sent.

Name: TREE PUBLISHING CO. INC.
Address: P. O. BOX 1273
NASHVILLE TENNESSEE 37202

**CERTIFICATION:** I, the undersigned, hereby certify that I am the (Check one)
☐ renewal claimant   ☒ duly authorized agent of: Willie Nelson
(Name of renewal claimant)

of the work identified in this application, and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature (X): Becky Pommer

Typed or printed name: Becky Pommer

Date: Jan 4, 1989

MAIL
CERTIFICATE
TO

TREE PUBLISHING CO. INC.
(Name)
P. O. BOX 1273
(Number, Street and Apartment Number)
NASHVILLE, TENNESSEE 37202
(City) (State) (ZIP code)

(Certificate will
be mailed in
window envelope)

FORM E

# Certificate
## Registration of a Claim to Copyright

In a musical composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America

This is To Certify that the statements set forth on this certificate have been made a part of the records of the Copyright Office. In witness whereof the seal of the Copyright Office is hereto affixed.

REGISTRATION No.

E  C P 156698

DO NOT WRITE HERE

*Register of Copyrights*
*United States of America*

**1. Copyright Claimant(s) and Address(es):**

Name ..FAMILY MUSIC, INC.................................................

Address 119. TWO MILE PIKE. GOODLETTSVILLE, TENNESSEE.......

Name .......................................................................................

Address ....................................................................................

**2. Title:** ..CRAZY....................................................................

(Title of the musical composition)

...........................................................................................

**3. Authors:**

Name WILLIE NELSON...................................... Citizenship ....................
(Legal name followed by pseudonym if latter appears on the copies)                              (Name of country)

Domiciled in U. S. A. Yes ☒ No ☐ Address GOODLETTSVILLE, TENNESSEE........ Author of ...............
(State whether words, music, arrangement, etc.)

Name ........................................................ Citizenship ....................
(Legal name followed by pseudonym if latter appears on the copies)                              (Name of country)

Domiciled in U. S. A. Yes ☐ No ☐ Address ....................... Author of ...............
(State whether words, music, arrangement, etc.)

Name ........................................................ Citizenship ....................
(Legal name followed by pseudonym if latter appears on the copies)                              (Name of country)

Domiciled in U. S. A. Yes ☐ No ☐ Address ....................... Author of ...............
(State whether words, music, arrangement, etc.)

**4. (a) Date of Publication:**

September 22, 19..

**(b) Place of Publication:**

U.S.A.
(Name of country)

**5. (a) Previous Registration or Publication:**

☐ Previous registration          ☐ Previous publication

**(b) New Matter in This Version:**

................................................................

*Complete all applicable spaces on next page*

6. **Deposit account:**

0019052690 0 1
0129032690 0 1

7. **Send correspondence to:**

Name ......... (N. ... SMITH)   Address 110 TO EAK PIKE, COOPERSVILLE, N...

8. **Send certificate to:**

(Type or print
name and address)

Name DE... SMITH, IN. (N... SMITH)

Address 110 TO EAK PIKE

CO...PILLE, I. ....SSEE
(City)          (Zone)          (State)

## Information concerning copyright in musical compositions

*Where To Use Form E.* Form E is appropriate for copyright registration of unpublished and published musical compositions by authors who are U. S. citizens or domiciliaries, and for musical compositions first published in the United States.

*What Is a "Musical Composition"?* The term "musical composition" includes compositions consisting of music alone, or of words and music combined. It also includes arrangements and other versions of earlier compositions, if new copyrightable work of authorship has been added.

*Song Lyrics Alone.* The term "musical composition" does not include song poems and other works consisting of words without music. Works of that type are not registrable for copyright in unpublished form.

—*Sound Recordings.* Phonograph records, tape recordings, and other sound recordings are not regarded as "copies" of the musical compositions recorded on them, and are not acceptable for copyright registration. For purposes of deposit, the musical composition should be written in some form of legible notation. If the composition contains words, they should be written above or beneath the notes to which they are sung.

*Duration of Copyright.* Statutory copyright begins on the date the work is first published, or, if the work is registered for copyright in unpublished form, copyright begins on the date of registration. In either case, copyright lasts for 28 years, and may be renewed for a second 28-year term.

### Unpublished musical compositions

*How To Register a Claim.* To obtain copyright registration, mail to the Register of Copyrights, Library of Congress, Washington 25, D. C., one complete copy of the musical composition, an application Form E, properly completed and signed, and a fee of $4. Manuscripts are not returned, so do not send your only copy.

*Procedure To Follow if Work Is Later Published.* If the work is later reproduced in copies and published, it is necessary to make a second registration, following the procedure outlined below. To maintain copyright protection, all copies of the published edition must contain a copyright notice in the required form and position.

### Published musical compositions

*What Is "Publication"?* Publication, generally, means the sale, placing on sale, or public distribution of copies. Limited distribution of so-called "professional" copies ordinarily would not constitute publication. However, since the dividing line between a preliminary distribution and actual publication may be difficult to determine, it is wise for the author to affix notice of copyright to copies that are to be circulated beyond his control.

*How To Secure Copyright in a Published Musical Composition:*

1. *Produce copies with copyright notice,* by printing or other means of reproduction.
2. *Publish the work.*
3. *Register the copyright claim,* following the instructions on page 1 of this form.

*The Copyright Notice.* In order to secure and maintain copyright protection for a published work, it is essential that

all copies published in the United States contain the statutory copyright notice. This notice shall appear on the title page or first page of music and must consist of three elements:

1. *The word "Copyright," the abbreviation "Copr.," or the symbol* ©. Use of the symbol © may result in securing copyright in countries which are parties to the Universal Copyright Convention.

2. *The year date of publication.* This is ordinarily the date when copies were first placed on sale, sold, or publicly distributed. However, if the work has been registered for copyright in unpublished form, the notice should contain the year of registration; or, if there is new copyrightable matter in the published version, it should include both dates.

3. *The name of the copyright owner (or owners).* Example: © John Doe 1954.

NOTE: If copies are published without the required notice the right to secure copyright is lost and cannot be restored.

---

**FOR COPYRIGHT OFFICE USE ONLY**

Application received

OCT 16 1961

One copy received

Two copies received

OCT 16 19...

Fee received

79735 ......

U.S. GOVERNMENT PRINTING OFFICE   1959 — O — 504406



# CRAZY

By WILLIE NELSON

© COPYRIGHT 1961 BY TREE PUBLISHING CO., Inc.
905 Sixteenth Avenue, South - Nashville, Tennessee
INTERNATIONAL COPYRIGHT SECURED        MADE IN U.S.A.        ALL RIGHTS RESERVED



**BMI**®

AGREEMENT made on  May 29, 2001 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and Sony/ATV Songs LLC, a Delaware Limited Liability Company ("Publisher") doing business as Tree Publishing Company, whose address is 8 Music Square West, Nashville, TN 37203.

### WITNESSETH:

1. The term of this agreement shall be the period from July 1, 2000 to June 30, 2005, and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2. As used in this agreement, the word "Work" or "Works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3. Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C. The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4. Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A. The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,



THIS PAGE INTENTIONALLY LEFT BLANK

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1) For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6. In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.



Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B. The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

P800

Page 4 of 10

B.  In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C.  In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A.  With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B.  Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C.  The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D.  Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E.  Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

13.  Publisher warrants and represents that:

A.  Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B.  Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A.  Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B.  Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C.  In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15.  Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A.  It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

     B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

     17.   BMI shall have the right, in its sole discretion, to terminate this agreement if:

     A.  Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

     (1) Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

     (2) Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

     (3) Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17.

     (4) Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

     B.  Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

     C.  Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

     In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

     18.  In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

     19.  Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20.  All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21.  Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22.  Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address furnished in writing by Publisher to BMI's Department of Writer/Publisher Administration.

23.  This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24.  Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25.  Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26.  This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27.  In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28.  Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.



IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

**BROADCAST MUSIC, INC**

By _~signature~_ .....................................................................................................................

_Assistant_ Vice President

---

**SONY/ATV SONGS LLC**
**d.b.a. TREE PUBLISHING COMPANY**

By _~signature~_ .............................................................................................. (S)

President

THIS PAGE INTENTIONALLY LEFT BLANK

P800

Page 10 of 10



# STANDARD SONGWRITERS CONTRACT

# Pamper Music, inc.

HOME OFFICE:
117 TWO MILE PIKE   GOODLETTSVILLE, TENNESSEE

PHONE                            ULysses 9-1343

Agreement made this           25           day of           August           19      by between

THE ABOVE FIRM
(hereinafter called the "Publisher") and

jointly and/or severally (hereinafter called "Writer(s)"):      WILLIE NELSON

# Witnesseth:

In consideration of the agreement herein contained and of the sum of One (1.00) Dollar and other good and valuable considerations in hand paid by the Publisher to the Writer(s), receipt of which is hereby acknowledged, the parties agree as follows:

1. The Writer(s) hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore unpublished original musical composition, written and/or composed by the above named writer(s), now entitled

**HELLO**

No.      including the title, words and music, and all copyrights thereof, including but not limited to the copyright registration thereof, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement to pay royalties herein contained and other good and valuable consideration in hand paid by the Publisher to the Writer(s), receipt of which is hereby acknowledged, the Writer(s) hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, all renewal and extensions of the copyrights of said musical compositions(s) to which the Writer(s) may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing, for the full term of all such renewals and extensions of copyrights.

2. The Writer(s) hereby warrants that the said composition is his sole, exclusive and original work, and that he has full right and power to make the within agreement, and that there is no adverse claims to or to the said composition. The Writer(s) hereby further warrants and represents that he is not a member of the American Society of Composers, Authors and Publishers, the Songwriters' Protective Association, or any other society or association which requires as a condition of membership the assignment of any right of any kind in said musical work and that no assignment of any of the rights herein set forth has been directly or indirectly made to Broadcast Music, Inc. or any other person, firm or corporation whatsoever.

3. The Writer(s) hereby warrants(s) that the foregoing musical composition is new and original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named herein and that said composition, including the title, words and music thereof, has been, unless herein otherwise specifically noted, the result of the joint efforts of all the undersigned Writers and not by way of any independent or separable activity by any of the Writers.

4. In consideration of this agreement, the Publisher agrees to pay the Writer(s) during the original and renewal terms of copyright throughout the world as follows:

(a) In respect of regular piano copies sold and paid for at wholesale in the United States of America, royalties of      ½ cents per copy;

(b) A royalty of ____      ½      cents per copy of dance orchestrations thereof sold and paid for in the United States of America;

(c) A royalty of ____      50 per cent of all net earned sums received by the Publisher in respect of regular piano copies and/or orchestrations thereof sold and paid for in any foreign country by a foreign publisher;

(d) The sum of One Dollar as and when the said composition is published in any folio or composite work or lyric magazine by the Publisher or licensees of the Publisher. Such publication may be made at any time in the discretion of the Publisher;

(e) In respect of copies sold and rights licensed or sold in the Dominion of Canada, the royalties to be paid to the Writer(s) shall be on the same royalty basis as herein provided for sales or licenses in the United States.

(f) As to "professional material"—Not sold or resold, no royalty shall be payable;

(g) An amount equal to      50 per cent of all net earned proceeds received and actually retained by the Publisher arising out of (1) the manufacture of phonograph records and other parts of instruments serving mechanically reproduce said composition; — (2) the use of said composition in synchronization with sound motion pictures;

Except as herein expressly provided, no other royalties shall be paid with respect to the said composition.

Notwithstanding anything contained in this agreement, the Publisher shall deduct ten percent of all net receipts used by it to licensees in the United States and elsewhere, as collection charges for the collection of the proceeds before computing the royalties payable under paragraph 4 of this agreement.

....2374 PAGE 674

...creed by and between all the parties hereto that all sums hereunder payable jointly to the
...divided amongst them respectively as follows:

| NAME | SHARE |
|---|---|
| WILLIE NELSON | 100% |

6. The Publisher shall render the Writer(s), as above, on or before each August 14th covering the six months ending June 30th; and each February 14th covering the six months ending December 31st, royalty statements accompanied by remittance for any royalties due thereunder.

7. Anything to the contrary notwithstanding, nothing in this agreement contained shall obligate the Publisher to make copies of said composition or shall prevent the Publisher from authorizing publishers, agents and representatives in countries inside and outside of the United States from exercising exclusive publication and all other rights in said foreign countries in said composition on the customary royalty basis; and nothing in this agreement shall prevent the Publisher from authorizing publishers in the United States from exercising exclusive publication rights and other rights in the United States in said composition, provided the Publisher shall pay the Writer(s) the royalties herein stipulated.

8. The Writer(s) may appoint a certified public accountant who shall, upon written request therefore, have access to all records of the Publisher during business hours relating to said composition for the purpose of verifying royalty statements hereunder.

9. The Writer(s) hereby consent to such changes, adaptations, dramatizations, transpositions, editing and arrangements of said composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. The Writer(s) hereby waive any and all claims which they have or may have against the Publisher and/or its associated, affiliated and subsidiary corporations by reason of the fact that the title of said composition may be the same or similar to that of any musical composition or compositions heretofore or hereafter acquired by the Publisher and/or its associated, affiliated and subsidiary corporations. The Writer(s) consents to the use of his (their) name and likeness and the title to the said composition on the music, folio, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assigns and licensees, and said composition, and agrees that the use of such name, likeness and title may commence prior to publication and may continue so long as the Publisher shall own and/or exercise any rights in said composition.

10. Written demands and notices other than royalty statements provided for herein shall be sent by registered mail.

11. Any legal action brought by the Publisher against any alleged infringer of said composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the litigation, a sum equal to thirty-three and one-third (33-1/3) per cent shall be paid to the Writer(s).

(a) If a claim is presented against the Publisher in respect of said composition, and because thereof the Publisher is jeopardized, it shall thereupon serve written notice upon the Writer(s), pertaining the full details of such claim known to the Publisher and thereafter until the claim has been adjudicated or settled shall hold any moneys coming due the Writer(s) in escrow pending the outcome of such claim or claims. The Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement, all of the costs, charges, disbursements, attorneys fees and the amount of the judgement or settlement may be deducted by the Publisher from any and all royalties or other payments therefrom or thereafter payable to the Writer(s) by the Publisher or by its associated, affiliated, or subsidiary corporations.

(b) From and after the service of summons in a suit for infringement filed against the Publisher with respect to said composition, any and all payments thereafter coming due the Writer(s) shall be held by the Publisher in trust until the suit has been adjudicated and then be disbursed accordingly, unless the Writer(s) shall elect to file an acceptable bond in the sum of payments in which event the sums due shall be paid to the Writer(s).

12. "Writer" as used herein shall be deemed to include all authors and composers signing this agreement.

13. The Writer(s), each for himself, hereby irrevocably constitute and appoint the Publisher or any of its officers, directors, or general managers, his (their) attorney and representatives, in the name(s) of the Writer(s), or any of them, or in the name of the Publisher, its successors and assigns, to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights hereinafter referred to...

14. The Publisher shall have the right to sell, assign, transfer, license or otherwise dispose of any of its rights in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of the Writer(s) to the royalties hereinabove set forth.

15. Notwithstanding anything to the contrary contained for in this agreement, in the event that any of the Writers are writer members affiliated with or members of BMI or ASCAP or of any other performance rights society, then so long as said Writer remains such a member, the Publisher shall not be obliged to pay to said Writer his share of the performance fee royalties hereunder.

16. This agreement shall be construed only under the laws of the State of New York. If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

17. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

WITNESS: _____

By _____

Writer _____

Address _____

Writer _____

Address _____

Writer _____

Address _____

**PLEASE SHOW PERMANENT
MAILING ADDRESS**

FOR AND IN CONSIDERATION OF ONE ($1.00) DOLLAR and other good and valuable considerations, in hand paid, receipt of which is hereby acknowledged, PAMPER MUSIC, INC. of 119 Two Mile Pike, Goodlettsville, Tennessee, hereby sells, transfers, assigns, and sets over to TREE PUBLISHING COMPANY, INCORPORATED of 905 Sixteenth Avenue, South, Nashville, Tennessee, its successors and assigns, every-where throughout the world, the entire right, title and interest in and to each and every musical composition controlled by PAMPER MUSIC, INC. including but not being limited to the compositions set forth in Exhibit A, annexed hereto and made a part hereof, and the copyright or copyrights thereof throughout the world, of the aforementioned compositions, and under all renewals and extensions of the copyright or copyrights thereof, together with all rights and interest of any kind whatsoever in and to the foregoing throughout the world now or at any time or times hereafter known or in existence, including all rights, benefits, causes of action and/or other emoluments arising or accruing from all contracts, licenses or otherwise heretofore issued with respect to the aforementioned compositions, throughout the world.

TO HAVE AND TO HOLD THE same unto the said TREE PUBLISHING COMPANY, INCORPORATED, its successors and assigns, forever.

IN WITNESS WHEREOF, the said PAMPER MUSIC, INC. has caused these presents to be executed by its duly autho-rized officer and the corporate seal hereunto affixed this 1st day of May, 1969.

PAMPER MUSIC, INC.

By

By

10/24/00  10:41 FAX 8157431799          SONY ATT                              ☒002

AGREEMENT made this 1st day of May, 1969 by
and between PAMPER MUSIC, INC. (hereinafter referred to as
"Seller"), TREE PUBLISHING COMPANY, INC. (hereinafter
referred to as "Buyer") and HAL SMITH and GARLAND HANK
COCHRAN.

IT IS MUTUALLY AGREED, as follows:

1.  The Seller hereby sells, transfers, assigns,
and sets over to Buyer, its successors and assigns, any and
all rights of any nature whatsoever throughout the world and
the entire title and interest throughout the world in and to
each and every composition controlled by the Seller includ-
ing without being limited to the compositions set forth in
Exhibit A annexed hereto and made a part hereof (hereinafter
called "said compositions"), and in and to any and all copy-
rights and extensions and renewals of copyrights and exten-
sions therein throughout the world, in said compositions and
the sole and exclusive right by the Buyer, its successors and
assigns (subject to foreign rights as shown on Exhibit "C"
attached hereto and made a part hereof/of ownership, use,
publication, sale, copyright and registration thereof, as the
sole owner and proprietor thereof throughout the world,
together with each and every right and use to which said
compositions and each and every part, arrangement and form
thereof can or may be put, and any and all benefits, advantages,
income, revenues, royalties, fees and rights of any and every
nature, kind and description whatsoever, derived and derivable,
due or to be due, accrued or which may, might or shall hereafter
accrue throughout the world, directly or indirectly from any
and every use and purpose whatsoever of said compositions or
any part thereof including but not by limitation the right to
receive royalties from Broadcast Music, Inc. (BMI) and all
other performing rights societies throughout the world, and
from any and every contract, agreement, right, privilege,
grant and license in respect thereof whether now or hereafter
known or in existence and whether within the contemplation
of the parties or not and from the literary and musical
property therein; it being the intention of the parties that
Buyer receives all monies, benefits and other emoluments
from and after the date hereof with respect to any and all
previous transactions, licenses and agreements of any kind
whatsoever, and all causes of action arising therefrom from
their inception.

- 4 -

Exhibit B are in full force and effect and may be assigned
by the Seller to the Buyer and that the Seller has performed
each and all of the terms, conditions and obligations on
its part to be performed with respect to each of the writers'
agreements set forth in Exhibit B and that there are no claims
of any nature whatsoever by any of the writers with respect
thereto and there are no unearned or unrecouped advances or
any encumbrances of any kind whatsoever with respect thereto.

7. This agreement shall be binding upon and enure
to the parties hereto, their successors and assigns.

IN WITNESS WHEREOF, we have hereunto set our hands
and seals the day and year first set forth above.

PAMPER MUSIC, INC.

By _____

TREE PUBLISHING COMPANY, INC.

By _____

_____
HAL SMITH

_____
GARLAND HANK COCHRAN

VOL. 1673 PAGE 21

BROADCAST MUSIC, INC.
(as owner of performing rights

TREE PUBLISHING CO., INCORPORATED

Copyright Registratic

| Song Title | Names of Writers | Date | Number |
|---|---|---|---|
| KING OF THE ROAD | Roger Miller | 11/16/64 | Ep 19471 |
| GREEN GREEN GRASS OF HOME | Curly Putman | 3/15/65 | Ep 19961 |
| MAKE THE WORLD GO AWAY | Hank Cochran | 4/15/63 | Ep 17432 |
| MY ELUSIVE DREAMS | Claude Putman Billy Sherrill | 4/3/67 | Ep 22989 |
| HEARTACHES BY THE NUMBER | Harlan Howard | 5/1/59 6/16/61 | Eu 57475 Ep 15440 |
| HEY WON'T YOU PLAY | Larry Butler | 2/12/75 | Ep 33426 |
| I FALL TO PIECES | Hank Cochran Harlan Howard | 12/27/60 6/16/61 | Eu 65199 Ep 15305 |
| SON OF A PREACHER MAN | John Hurley Ronnie Wilkins | 9/19/68 | Ep 24986 |
| FUNNY HOW TIME SLIPS AWAY | Willie Nelson | 5/24/61 | Ep 15229 |
| CRAZY | Willie Nelson | 10/16/61 | Ep 15669 |
| TIPS OF MY FINGERS | Bill Anderson | 3/28/60 | Ep 13927 |
| YAKETY AXE | Randy Randolph James Rich | 2/12/63 | Ep 17204 |
| HUSBAND AND WIVES | Roger Miller | 1/24/66 | Ep 21250 |
| HEARTBREAK HOTEL | Mae Boren Axton Tommy Durden Elvis Presley | 1/3/56 3/12/56 | Eu 42462 Ep 97548 |
| IS ANYBODY GOIN TO SAN ANTONE | Dave Kirby Glenn Martin | 4/14/69 | Ep 25776 |